## Case No. 7,416.

JOHNSON v. TOMPKINS et al.

[1 Baldw. 571.] [1]

Circuit Court, E. D. Pennsylvania. April Term, 1833.

[1] [Reported by Hon. Henry Baldwin, Circuit Justice.]

J. Randall and Mr. Kittera, for plaintiff.

Mr. Rawle, Jr., and Mr. Sergeant, for defendants.

BALDWIN, Circuit Justice (charging jury). The facts of this case are not complicated, nor is there much contest about those which are material to its decision; the questions of law however are of the last importance. involving the rights of property and the personal rights of the citizens of this and other states. to an extent which calls for a plain expression of our opinion, in order to have the law finally settled by the supreme court, on the interesting subjects now before us.

On a question of slavery or freedom, the right is to be established by the same rules of evidence as in other contests about the right to property,—[Queen v. Hepburn] 7 Cranch [11 U. S.] 295.—quiet and undisturbed possession is evidence of ownership, and cannot be disturbed by any one who has not the right of property, and the burthen of its proof rests on the one who is not in possession. In this case the proof of Jack being the slave of the plaintiff. is full, clear, and uncontradicted; Jack admitted that he was a slave till thirty years of age, when he alleges he was entitled to his freedom by the will of a former master; this assertion is wholly unsupported by proof, and contradicted by the will in evidence before you. Were this a trial between Jack and the plaintiff on a question of freedom, there could be no doubt on the evidence before you, a bill of sale is not necessary to show the property to be in the plaintiff, it may be proved by parol evidence. or inferred from long possession. [Pirate v. Dalby] 1 Dall. [1 U. S.] 169. The ownership of Jack being thus clearly made out. he must be deemed to be the property of Mr. Johnson. over which he has the same control as over his land or his goods. It is not permitted to you or us to indulge our feelings of abstract right on these subjects; the law of the land recognises the right of one man to hold another in bondage. and that right must be protected from violation. although its existence is abhorrent to all our ideas of natural right and justice.

As a consequence of this right of property, the owner may keep possession of his slave; if he absconds, he may retake him by pursuit into another state, and may bind or secure him in any other way, to prevent his second escape, he may arrest him by the use of as much force as is necessary to effect his reclamation; he may enter peaceably on the property or into the house of another, taking care to commit no breach of the peace against third persons. But it is no breach of the peace to use as much force or coercion towards the fugitive as suffices for his security, as without such force no slave could be re-taken, without his consent. The master may also use every art, device or stratagem to decoy the slave into his power; odious as these terms may be in their application to an unlawful act, they ought to be considered as far otherwise when used for a lawful and justifiable purpose. It is every day's practice to detect counterfeiters, and those who pass counterfeit money, by employing persons to purchase it from them; it is necessary for the purpose of public justice that such and similar means should be resorted to, or criminals would escape detection; they are neither immoral nor illegal. This right of a master to arrest his fugitive slave, is not a solitary case in the law; it may be exercised towards a fugitive apprentice or redemptioner, to the same extent, and is done daily without producing any excitement; an apprentice is a servant, a slave is no more; though his servitude is for life, the nature of it is the same as apprenticeship or by redemption, which, though terminated by time, is, during its continuance, as severe a servitude as that for life. Of the same nature is the right of a parent to the services of his minor children, which gives the custody of their persons. So where a man enters special bail for the appearance of a defendant in a civil action, he may seize his person at his pleasure, and commit him to prison, or if the principal escapes, the bail may pursue him to another state, arrest and bring him back, by the use of all necessary force and means of preventing an escape. The lawful exercise of this authority in such cases is calculated to excite no sympathy; the law takes its course in peace. and unnoticed, yet it is the same power. and used in the same manner, as by a master over his slave. Had Jack been the apprentice of Mr. Johnson, or had he been the special bail of Jack, he would have the same right to re-take him as he had by being his owner for life; the right in each case is from the same source, the law of the land. If the enforcement of the right excites more feeling in one case than the other. it is not from the manner in which it is done, but the nature of the right which is enforced; property in a human being for life. If this is unjust and oppressive, the sin is on the heads of the makers of laws which tolerate slavery. or in those who have the power. in not repealing them; to visit it on those who have honestly acquired. and lawfully hold property, under the guarantee

and protection of the laws, is the worst of all oppression, and the rankest injustice towards our fellow-men. It is the indulgence of a spirit of persecution against our neighbours, for no offence against society or its laws; for no infringement of the rights of others, but simply for the assertion of their own in a lawful manner. If this spirit pervades the country; if public opinion is suffered to prostrate the laws which protect one species of property, those who lead the crusade against slavery may, at no distant day, find a new one directed against their lands, their stores and their debts; if a master cannot retain the custody of his slave, apprentice, or redemptioner, a parent must give up the guardianship of his children. bail have no hold on their principal, the creditor cannot arrest his debtor by lawful means, and he who keeps the rightful owner of lands or chattels out of possession, will be protected in his trespasses.

When the law ceases to be the test of right and remedy; when individuals undertake to be its administrators by rules of their own adoption, the bands of society are broken as effectually by the severance of one link from the chain of justice, which binds man to the laws, as if the whole was dissolved. The more specious and seductive the pretexts are under which the law is violated, the greater ought to be the vigilance of courts and juries in their detection; public opinion is a security against acts of open and avowed infringements of acknowledged rights; from such combinations there is no danger; they will fall by their own violence, as the blast expends its force by its own fury. The only permanent danger is in the indulgence of the humane and benevolent feelings of our nature, at what we feel to be acts of oppression towards human beings endowed with the same qualities and attributes as ourselves, and brought into being by the same power which created us all; without reflecting that in suffering these feelings to come into action against rights secured by the laws, we forget the first duty of citizens of a government of laws; obedience to its ordinances. The opinion of Judge Washington, in Hill v. Low [Case No. 6,494], meets our entire concurrence. "That if a man should honestly believe that the person claimed as a fugitive did not in fact owe service to the claimant. he could not in his defence allege ignorance of the law, and that such matters were unfit for the inquiry of the jury. That it was sufficient to bring the defendant within the provisions of the law, if having notice either by the verbal declarations of those who had the fugitive in custody, or were attempting to seize him; or by circumstances brought home to the defendant, that the person arrested was a fugitive or was arrested as such." The case must be decided by the facts in evidence, and will not be influenced by the defendant's belief or knowledge of them in any other way

than in mitigation of damages, if you are satisfied that they were really ignorant of Jack's situation, and they believed him free.

Their interference was purely voluntary. The first inquiry then is, was it justifiable? The slave was arrested on Sunday, it is true, but no law prohibits a man from protecting or reclaiming his property on that day. 5 Serg. & R. 301. Working on Sunday is no breach of the peace (1 Serg & R. 350) when done without noise or disorder. A justice of the peace has no right to enter on the land of another on Sunday for the purpose of obtaining evidence of a breach of the Sabbath against the will of another. He ought tó summon the offenders the next day, and proceed against them in the usual manner. Id. 351. If the service of process on Sunday was illegal, except for a breach of the peace or felony, the defendants could not arrest or detain the Jersey party without process or legal authority for any other cause. The slave, it seems, was seized in the twilight or night, but that did not justify the interference of the defendant to. rescue him, or obstruct the plaintiff in removing him; the putting of irons upon him is of itself no justification of the infliction of any violence upon the plaintiff. If it was an act of unnecessary severity, it would be a circumstance for which you would make a proper allowance in assessing damages, as one which would mitigate the conduct of the defendants, by the excitement which it would be apt to produce.

If you believe the evidence, the plaintiff has established his right to arrest Jack; proof of his slavery and owing service to him absolves him from the risk he ran in seizing him; but the same fact which absolves him makes the defendants liable, if they have done any act not warranted by law by which the plaintiff has suffered an injury. It is contended that they had a right to arrest the plaintiff and his party when in the act of committing, attempting to commit a felony, or doing an act which might amount to a felony, and prevent its commission thereby; and such is undoubtedly the law. There may be an arrest without warrant by a public officer, or a private person, who sees another commit a felony; or if a felony is known to have been committed, the person committing it may be pursued and arrested; and when there is only probable cause of suspicion a private person may, without warrant, at his peril make an arrest. 6 Bin. 318, 319. A constable may arrest without warrant for a breach of the peace in his presence, and commit the offender to jail for safe keeping, so may a private person for felony, or on an affray which has taken place in his presence, or where an arrest is made on suspicion. 8 Serg. & R. 49. 50. Such is the law of Pennsylvania. which secures the peace of the public. but the law does not stop here; it does not leave the citizen at the mercy of peace officers or in-

dividuals; they make the arrest at their peril; in the emphatic language of the late Chief Justice Tilghman: "I say at his peril, for nothing short of proving the felony will justify the arrest" (6 Bin. 319); and the present chief justice, in declaring the right of the constable to arrest in such case says: "There is no danger to the liberty of the citizen in this, for if the arrest and detention be improper, the prisoner can have instant redress by the writ of habeas corpus, and the constable may be punished by indictment, or subject to damages in an action of trespass." 8 Serg. & R. 50. The law is the same as to the plaintiff. At the common law a master had a right to take up his runaway servant, and for this, as for any other lawful purpose, might enter peaceably into any house, unless forbidden by the owner. Any person with authority from the master might do the same. The domestic authority of masters and parents must be supported, as essential to the peace of society, and contributing to a due subordination to the authority of government (Addison, 325), the acts of assembly do not give, but only enforce this right. If the person arrested is not a servant or slave, or the person making the arrest has not the authority of the master for so doing, he is in either case liable for the illegal arrest.

You will therefore consider the law as settled, that where an arrest is made without a warrant from a proper officer, the person making the arrest is liable in damages to the party arrested, if he is innocent of the offence with which he is charged, and for which he has been arrested, though the person arresting may have honestly believed the other guilty; though there was ground for suspicion, or probable cause for the arrest, he is liable to an action for the arrest, unless actual guilt appears. These circumstances will weigh with a jury in reducing damages, but as the arrest turns out to be illegal, it cannot be justified; the reason is obvious, though the public peace requires the speedy apprehension of offenders against the law, it does not authorize the imprisonment of the innocent; from this rule there is no exception, where the arrest is without warrant. If a lawful warrant is directed to an officer, or a private person, and he does not exceed or abuse the authority it confers, he is liable to no action, though the person who is described in the warrant, and arrested, is wholly innocent of the offence charged; this is also an incontestable principle of the law; so that while innocent men are protected in their liberty against arrests, by officers or private persons, on their own authority, the latter are equally protected in the execution of lawful process. In the one case they act at the peril of the party arrested being guilty, in the other the law absolves them from any responsibility. The law is the same if a constable seizes a person as a runaway servant, by order of one

claiming to be his master, he is liable to an action if the person arrested is not his servant; but if he apprehends him on a warrant from a magistrate no action lies against him.

You will then apply these rules of law to the case before you, and inquire whether the plaintiff, and those acting under his authority, committed any felony or breach of peace, in seizing, securing, and carrying Jack to the house of Marples, in Hatborough. The record of their acquittal is conclusive evidence of their innocence of the offences charged in the indictment preferred against them at Norristown, either jointly or severally; you are bound to consider them each and every one as not guilty of any of the matters charged as a felony or offence under the act of assembly of March, 1820, or the common law. Independently of this acquittal, if Jack was the slave of the plaintiff, neither he nor the others of his party could be guilty of kidnapping, under that or any other law of the state. So long since as 1795, the supreme court unanimously decided that it was no offence, under the seventh section of the act of March, 1788, for a master to arrest his slave forcibly, and carry him out of the state; that the law was intended, and only applied, to carrying a freeman out of the state into bondage. [Respublica v. Richards] 2 Dall. [2 U. S.] 226. The law of 1820 (section 1), on which the plaintiff was prosecuted, was copied from the law of 1788, and must receive the same construction; its reenaction, with the full knowledge which the legislature must be presumed to have had of its judicial exposition by the supreme court, which had remained unquestioned for twenty-five years, without any alteration, is to be considered as not intended to alter, and as not altering the law on the subject. The rule thus established by the legislature and courts of the state, is the rule for our decision, both by the thirty-fourth section of the judiciary act, and the uniform decisions of the supreme court of the United States; it need not, therefore, be regarded with any jealousy, as opposed to the laws, policy or feelings of the state or the people thereof; neither do we think it necessary to add any reasons to those given by Chief Justice M'Kean, Respublica v. Richards [supra], in the charge of the court to the jury. "The severity of the punishment to be inflicted in case of a conviction (a punishment the same, in its nature, as is inflicted for the most infamous crimes), ought certainly to induce the jury to deliberate well, before they determine, that the act committed by the defendant constitutes the offence, which is the object of the law. The extravagant operation and extent of the doctrine on which the prosecution is maintained, ought also to awaken the most serious attention, for it has been contended, in effect, that should a traveller bring into this state a negro or mulatto slave; nay, should a tradesman of Pennsylvania have a negro or mulatto indented servant, who being sent

on an errand, loiters away his time in tippling, in debauchery, the master cannot forcibly seize and carry the delinquent to another place, either beyond or within the jurisdiction of Pennsylvania, without incurring the penalties of the act of assembly: if it is intended afterwards to keep and detain the negro or mulatto as a slave or servant. Is it rational to conceive, that any legislative body would have destined for such an act so grievous a punishment? Again: It has been alleged that the law has made no difference, and therefore, that the court can make none, between a freeman and a slave, provided the injured party is a negro or mulatto. But is it possible that any individual of common sense, that any assemblage of enlightened men should so confound the nature of things, should so pervert the principle of justice, as to suppose, that it is as criminal for a master to carry off his own slave with the intent to retain him in slavery, as for a stranger to carry off a freeman, with the intent to sell him into bondage? Can these actions merit the same degree of punishment? It is evident however that such enormities are not imputable to the legislature of Pennsylvania. By the tenth section of the act for the gradual abolition of slavery (1 Dall. 841) persons merely sojourning in this state have a right to retain their slaves for a term of six months, and the delegates in congress from other states, foreign ministers and consuls, enjoy that right as long as they continue in their public characters; the succeeding section likewise expressly provides that absconding slaves shall derive no benefit from the law, but that their masters shall have the same right and aid to demand, claim and take them away that they had before. This act of assembly, and particularly these provisions, are not repealed by the supplemental act on which the prosecution is founded. Then we find that any traveller who comes into Pennsylvania upon a temporary excursion for business or amusement, may detain his slave for six months, and the previous law (recognised by act of assembly during that term), authorizes the master to apprehend the slave, and entitles him to the aid of the civil police to secure and carry him away. By a regulation of this kind the policy of our own system is reconciled with a due respect to the system of other states and countries, while an opposite construction would render it impossible for any American or foreigner to pass with a slave through the territory of Pennsylvania. It has been said that the word slaves, or servants, which are used in the other provisions of the supplemental act, being omitted in this section, it must be inferred that the legislature intended to protect the slave or servant as well as the freeman from the outrage contemplated; but, in our opinion, that very omission shows the fallacy of such a construction, for if the legislature designed to protect freeman and not slaves, they could not in any other way more effectually manifest their meaning. In short, the evil apprehended was that of forcing a free negro or mulatto into another country and there taking advantage of his colour to sell him as a slave, and for such an offence the punishment denounced by the law would be justly inflicted. Upon a review of the facts, likewise, we find occasion to regret that the prosecution should have been conducted with a zeal which rarely appears in the prosecution of the highest criminal on the strongest proof. There is not, however, a tittle of evidence to establish the charge that the defendant seduced the negro, or that he even spoke to him in Pennsylvania, where the action of seduction must be committed to vest the jurisdiction in the court. Nor can it be fairly said that he caused the negro to be seduced, for the advice given to General Sevier was merely the advice of a friend, which could not surely merit the ignominious punishment of the law, and which was not in fact adopted, as the negro was forcibly, and not by seduction sent out of the state. But, upon the whole, we were unanimously of opinion, as soon as it was proved that the negro was a slave, that not only his master had a right to seize and carry him away, but that in case he absconded or resisted, it was the duty of every magistrate to employ all legitimate means of coercion in his power for securing and restoring the negro to the service of his owner, whithersoever he might be afterwards carried."

We have laid down the law to be, that bail may arrest their principal; this, too, we have done in accordance with the decisions of the supreme court of this state. "In the relation in which the several states comprising the union stand to each other, the bail in a suit entered in another state, have a right to seize and take the principal in a sister state, provided it does not interfere with the interest of other persons who have arrested such principal." 2 Yeates, 264. Special bail may take up the principal when attending court, or at any time he pleases. "It has been quaintly said that the bail have their principal always on a string, and may pull the string whenever they please, and render him in their own discharge. 4 Yeates, 125; S. P. 3 Yeates, 37." The court refer to and adopt the law as laid down in England, in the same words (6 Mod. 231) in which it is added they may take him even on a Sunday, "and confine him till the next day, and then render him;" it is therefore the common law of Pennsylvania as well as of England. We have also stated the law to be that apprentices, redemptioners, slaves and servants who abscond from the service of their masters, may be apprehended wherever they may be found; this we have done not only on the authority of the courts of Pennsylvania, but of its various laws. By the act of 1770, yet in force, a fugitive apprentice may be apprehended by a warrant from a justice, and com-

mitted to jail till he will consent to return to his master, or give security to answer his complaint. Purd. Dig. 42. This act was extended to redemptioners in 1820. If any person harbour him without giving notice to his master, he shall pay 20 shillings a day (Id. 43), and the apprentice to serve five days, for each day's absconding (Id. 829). The act of March, 1780, which declared all issue of slaves born after that day to be free, unless registered according to its provisions, puts negro and mulatto servants, till twenty-eight, on the same footing as servants by indenture. 1 Dall. 839, 840, § 4. The reward for taking up runaway and absconded negro and mulatto servants and slaves, and the penalties for enticing away, dealing with, or harbouring them, are also the same as in the case of servants bound for four years. Id. 841, § 9. It was "provided that this act, or any thing it contained, shall not give any relief or shelter to any absconding or runaway negro or mulatto slave or servant, who has absented himself, or shall absent himself from his or her owner, master or mistress; residing in another state or country; but they shall have like right and aid to demand, claim, and take away his slave or servant as he might have had in case this act had not been made." Id. 842, § 11. This section remained in force till 1826; it was therefore applicable to this case in 1822. It is all important, as evincing the spirit, policy and feeling of the state, to be utterly opposed to the relief or sheltering of absconding or runaway slaves or servants from other states, or considering the masters who come to reclaim them as felons. On the contrary, it expressly declares that they shall have right and aid, to demand, claim and take away his slave or servant; and in order that the meaning of this part of the law should not be misunderstood, that the benevolent objects of the legislature, as declared in the preamble, should not be perverted to purposes forbidden by the law, it puts the master on the same footing as to carrying his slave out of the states. as if the law had never been passed. This is language which cannot be misunderstood.

It is due to the character of the state that its own laws at least should be respected in courts of justice, by all who are concerned in its administration; it is our most solemn duty to enjoin it on you to take the law of the land as you see it in the statute books, and enforce it according to its provisions. Remember too that this law is that act which has been the pride of Pennsylvania. as one of the most noble and glorious emanations from the spirit of the revolution, as declared in the preamble, which has been read to you with the most touching force and eloquence. But you must not take the spirit of the law according to the impulse which operates to rouse the feelings of counsel in the cause of their clients; look on it. examine its enactment, not only with a watchful eye. but if

you please, in the plenitude of philanthropic zeal in the cause of oppressed humanity. To relieve the oppressed, rescue the free from bondage, to punish those who violate the rights of man and humanity, to protect our fellow-man from injustice, and to secure to all alike the benefit of the laws, are the imperious duties of jurors. In obedience to such dictates we call your attention to the laws for the gradual abolition of slavery in Pennsylvania. The two first sections are the preamble. The third declares that no child hereafter to be born shall be a servant for life or a slave. The slavery of children in consequence of the slavery of their mothers, is for ever abolished. The fourth has been noticed. The fifth directs slaves to be registered before the 1st of November, 1780. The seventh directs negroes to be tried for crimes and offences like other inhabitants. The tenth declared all unregistered slaves to be free, except the domestic slaves of members of congress. foreign ministers and consuls, and persons passing through or sojourning in the state, not resident in it, and seamen not owned in the state or employed in ships belonging to the inhabitants of the state. This is the substance of the abolition act. The eleventh excepts fugitives, as has been noticed. This law was explained and amended by the act of March, 1788, which declared all slaves brought into the state by persons residing or intending to reside in it, to be immediately free; prohibits the taking of the slave out of the state with intent to change his place of residence, or selling him for such purposes, directs the registry of the children of slaves, and punishes kidnapping. In the spirit of these laws the legislature passed "An act to incorporate a society by the name of the Pennsylvania society for promoting the abolition of slavery, and for the relief of free negroes unlawfully held in bondage, and for improving the condition of the African race." No society was ever founded for nobler objects, or more deserving of public encouragement and approbation; but it was no part of the design or objects of this benevolent society, to protect or rescue runaway slaves from the claims of their masters. It was provided in their charter that their by-laws, rules, orders and regulations enacted, or to be enacted, be reasonable in themselves, and not contradictory to the constitution and laws of the state. Acts Assemb. A. D. 1789, pp. 218, 223. So far as has come to our knowledge or information, this society has acted on the philanthropic principles of its institution, and none other, never interfering with the rights of property, as secured by the laws, they have not infringed the condition of their charter, but pursued their legitimate objects with untiring zeal. If they have been perverted by any honorary member, like Mr. Ellis. by contributing money to employ counsel to prosecute a master for lawfully seizing and taking away his runaway slave, we are well convinced that it

has been equally repugnant to the feelings and practice of the members of the society, as it would be to their charter.

These laws remained unchanged till 1820, when an act was passed on the subject, the provisions of which need not be particularly recited; the proviso in the second section is, however, important: "Provided always, that nothing herein contained shall be construed as a repeal or alteration of any part of an act of assembly, passed 1st March, 1780; or of any part of the act of 29th March, 1788, except the seventh section, which is repealed." This is the section which prescribed the punishment for kidnapping, and was copied except as to the punishment, into the first section of the law of 1820. By the law of 1788, the punishment was a fine of 100 pounds, and confinement at hard labour not less than six, or exceeding twelve months, until the costs be paid. 2 Dall. 589. By the law of 1820, the fine was not less than 500 dollars, or more than 2,000 dollars, to be deemed guilty of a felony and sentenced to undergo a servitude not less than seven or more than twenty-one years, confined, kept to hard labour, fed and clothed as is directed by the penal laws of this commonwealth, for persons convicted of robbery. Purd. Dig. 653. The punishment of the first offence of robbery is a servitude of not less than one or more than seven years, and for a second offence not exceeding twelve years. Act 1829; Purd. Dig. 821. On the first conviction of murder in the second degree, the punishment is servitude for not less than four or more than twelve years; for the second offence, confinement for life. Act 1829; Purd. Dig. 648.

The penal laws of Pennsylvania are just, mild and humane; her penal code is admired not only in this, but in all the civilized nations of the world. Here punishment is graduated in proportion to the enormity of the offence, and cruel punishments are expressly forbidden by the constitution, as well as excessive fines (article 9, § 13) and by the eighth amendment to the constitution of the United States. That offence must be dark and black indeed, which is in the view of the legislature so much more heinous than highway robbery or wilful murder. Can you believe that it was their intention to subject the man who arrested his own fugitive slave by force, with the intention of conveying him to his home in another state, to a punishment greater in a threefold degree than the most aggravated highway robbery, and for a time exceeding by nine years the utmost term of servitude which a court could, for the first offence, inflict on the vilest murderer, whose forfeited life may have been spared by the mistaken humanity of a jury? Would a wise, just, or humane body of men pass a law which would put on a level the man who reclaimed his own property by lawful means, and the wretch who would drag a freeman into bondage, and punish as felons of equal grade, a respectable farmer from an adjoining state, with the sor-

did habitual trafficker in human flesh, the lawful taking of one's own property, with the stealing of a human being? When the punishment of kidnapping was only a fine of 100 pounds, and the extent of confinement only one year, the supreme court declared that such enormities were not imputable to the legislature of Pennsylvania; we should do them great injustice not to rescue them a second time from the imputation, when the fine is greatly increased, and the servitude extended not only to seven, or twenty-one times the extent, but directed to be as a felon, and highway robber; law, justice and humanity combine to repel an idea so dreadful. The great and benevolent act for the gradual abolition of slavery did not abolish the distinction between bond and free negroes and mulattoes, the freeman and the absconding slave, the master who brought his slave here to reside, and the master who came here in pursuit of one who absconded from him; and when you are invoked to respect the legislation and spirit of the state, you will remember that this consists in obedience to its laws, which expressly declare; that they give no relief or shelter to runaway slaves from other states; that their master shall have a like right and aid to demand, claim, and take them away, as if the law for the abolition of slavery had never been passed; and remember too that this law is expressly declared not to be changed or repealed by the law of 1820, under colour of which the defendants claim the right to consider the plaintiff as a felon for doing the very act, for which he had a right to aid, help and assistance by the abolition act, and by which the runaway slave was denied relief or shelter within the state.

While the abolition act put free blacks on the footing of free white men, and abolished slavery for life, as to those thereafter born, it did not otherwise interfere with those born before, or slaves excepted from the operation of the law; they were then, and yet are, considered as property; slavery yet exists in Pennsylvania, and the rights of the owners are now the same as before the abolition act; though their number is small, their condition is unchanged. The rights of the owners of fugitive slaves to take them to their homes in another state, were as perfect in 1822, as they were before the revolution; these rights are defined by the abolition act in the most plain, explicit terms, without any condition imposed on their exercise. The right was complete and perfect, if there existed between the person seizing and the person seized, the relation of owner and slave, or master and servant, the master or owner might take away his slave or servants to another state or country where he resided, without the consent of the negro, the person with whom he lived, the neighbourhood, or the order or warrant of any magistrate. The law was his warrant, his authority, in the execution of which the master had a right to aid, and it is by this law that the rights of the parties in this suit·

must be tested in this case. If Jack, therefore, was the slave or servant of Mr. Johnson, the act of seizure was lawful; and if the defendants, or any of them, beat, assaulted, arrested or imprisoned him, or any one acting by his authority, the act was illegal without the lawful warrant or authority of any officer of the law. Had the defendants any such authority?

In inquiring into the laws of Pennsylvania, on the subject of the rights and liberties of its citizens, and those of other states, a court who is to decide and instruct a jury upon them according to the law of the land, is not at liberty to overlook that law which is supreme. The eighth section of the ninth article of the bill of rights in the constitution of Pennsylvania declares, "that the people shall be secure in their persons, houses, papers and possessions from unreasonable searches and seizures; and that no warrant to search any place or to seize any person or things, shall issue without describing them as nearly as may be, nor without probable cause supported by oath or affirmation." The fourth amendment to the constitution of the United States declares, "that the right of the people to be secure in their persons, houses, papers and effects against unreasonable searches and seizures, shall not be violated, and no warrant shall issue but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the person or things to be seized. The supreme court of this state have decided that a warrant for forgery issued by a president of the court of common pleas, on the ground that it appeared to the judge from common report that there was strong reason to suspect the party charged to be guilty, and that he was likely to depart and retreat to parts unknown, before the witnesses could be summoned to appear before the judge to enable him to issue a warrant on oath, was illegal on the face of it, and a constable not bound to execute it. 3 Bin. 43, 44; Purd. Dig. 510. The first order issued by Judge M'Neil was to John Kenderdine, without oath, affirmation or any probable cause whatever; on the mere statement made by him, the particulars of which the judge has been unable to recollect. so as to even state them at the trial for our information; if instead of a verbal direction to bring the Jersey party before him, he had issued a warrant for the purpose, the legal result would have been the same. Being in direct violation of both constitutions, utterly wanting every requisite prescribed, this order was, as every warrant or written authority from the judge would have been. utterly illegal, null and void, to all intents and purposes; affording no justification to Kenderdine to execute it, or to any one in assisting him. any act done under such an order is as illegal as if none had been given, and for any injury done to the person or property of the plaintiff, or the others of his party. an action would lie as well against the judge as all those who

acted in pursuance of that order, whether it issued to bring the parties before the judge to prove the plaintiff's property in Jack, or to answer for a crime or any offence against the laws. The liberties of our citizens do not depend on such a tenure as an admission of the legality of this order would imply; nor are constitutional provisions for their protection, to be deemed such solemn mockeries as we should make them by justifying the conduct of the defendants in pursuance of it. You will therefore consider every act done by them, or any of them, every assault or offer of force, arrest, confinement, or restraint of the personal liberty of any of the Jersey party, under or by virtue of the order of Judge M'Neil, as wholly without authority of the law, and in direct violation of its most solemn provisions.

We now come to the second order of the judge. The judge tells us that he took it for granted, from seeing the justice and constable in company, that the Jersey party were in their legal custody, and in consequence of such belief, he suggested the propriety of committing the negro to the county jail, and binding over the other party to prove their property, if they had any. If you believe the statement of the judge. there can be no difficulty in deciding on the merits of this part of the transaction, taking it in either way. As a compulsory proceeding on the Jersey party to compel them to prove the property in Jack, it was without any authority of law as utterly void as the former order. If it was to detain, confine or arrest them on a criminal accusation, it was unconstitutional, for the want of an oath and probable cause; there is no evidence of even an accusation made against them in any specific shape, or charging any definite offence; the judge does not state that any application was made for any process to be issued by him; if he is credited, he gave no order, but only suggested, advised or recommended the course he pointed out. You will judge. from the whole evidence, what was the nature and object of the proceeding before the judge. and of what he did advise or direct. By referring to that part of the book of Justice Tompkins which has been read, it seems to have been well understood by him at least, "that it was thought advisable to commit the said Jack to jail for safekeeping, until the said Caleb Johnson should have an opportunity to prove his property." The recognizance of Mr. John and Justinian Kenderdine, taken on their return from the judge's on Sunday night, shows their understanding of the matter; the condition was to deliver the said Caleb Johnson. whenever his claim is completely established, or deliver him up at the next court of quarter sessions of Montgomery county, etc. This was the only act of Mr. Tompkins which appears to have been done officially by him that night, of which there is any evidence. unless the setting Jack free under the recognizance was intended to be an official act. As the advice or di-

rection of Judge M'Neil was not pursued by the commitment of Jack, the condition of the recognizance was one which the judge or jus-tice had no power or right to impose; the proceeding at the judge's was wholly illegal, and the detention of the Jersey party that night lawless and unjustifiable.

We now come to the proceedings before the justice on Monday morning. Accord-ing to the account of Mr. Roney, the con-stable, no witnesses were examined, no oath or affirmation was administered by the jus-tice, or any question put to the Jersey party, except whether they had bail; they said they could procure bail if they had an op-portunity; the justice said he must commit them, and took up his pen to write, the con-stable then said he would be forthcoming for their appearance next morning, and they returned to the Billet. Skillman gave the same account of this part of the transaction of the justice's. If you believe this state-ment, it is the worst part of the transac-tion; with ample time to proceed deliber-ately in due form of law, with no crowd or confusion to prevent a full and patient ex-amination, there was no excuse for not strictly pursuing every step required by the law and constitution. The question of Jack's slavery had assumed a definite shape by his admission before the judge in the presence of Justice Tompkins and the rest of the party, that he was born a slave, and that he had lived with Mr. Johnson as such; he admitted his slavery till he was thirty, when he alleged he was free by the will of Judge Berrian, of New Jersey. The produc-tion of this paper then was necessary to make out the truth of Jack's assertion, but it does not appear to have been called or sent for, nor was Jack called on to verify his statement on oath, though he was a competent witness against Mr. Johnson, if he was a free man or only a servant for years. There could not be probable cause for the prosecution, unless there was at least some legal evidence of his freedom made out by oath or affirmation. Jack's as-sertion, not under oath or affirmation, was not even the shadow of probable cause to jus-tify the justice in committing, arresting, de-taining or issuing a warrant for the appre-hension of the Jersey party, or any of them. Does the evidence of Robert Tompkins change the result? It is your exclusive province to decide on his credibility, you may believe or disbelieve his evidence, as you may think proper; but in giving you our opinion as to its legal effect, we must consider it as true. He says that John and Sarah Kenderdine were examined before the justice, but does not state what evidence was given, and no paper or book containing it was given in evidence; this removes one constitutional objection; but it leaves the proceedings open to another fatal one, the want of probable cause on which to issue a warrant or order of arrest. This witness

does not state whether any of the other par-ty were present or not. This is an all im-portant matter. The ninth section of the ninth article of the state constitution pro-vides, "that in all criminal prosecutions the accused hath a right to be heard by himself and counsel, to demand the nature and cause of the accusation against him, and to meet the witnesses face to face." The sixth amendment to the constitution of the Unit-ed States provides, "that the accused shall enjoy the right to be informed of the nature and cause of the accusation against him, and to be confronted with the witnesses." It is therefore incumbent on the defendants to satisfy you that the parties accused be-fore the justice, were present on the exam-ination of the witnesses against them; if it took place before they were brought before him, and was not read to them or informa-tion given to them of its substance; or if it was had after they left the office, or done at any time, as a colour or cover for the proceedings which took place, without the presence or knowledge of the accused, it was not only utterly lawless, but aggravat-ed by being done under the pretence of con-formity to the provisions of the constitu-tion. Ex parte Bollman, 4 Cranch [8 U. S.] 124. As to all the proceedings then of the defendants which took place, either for the purpose of taking the Jersey party before the justice or judge to prove the property of the plaintiff or to establish a charge of kidnapping; we instruct you, without hesi-tation, that they were without any warrant or authority of law, wholly unqualified and illegal.

We will now inquire whether there was any lawful cause to arrest on any other ground. The first section of the bill of rights in the constitution of Pennsylvania declares, "that all men have the inherent and indefeasible right of enjoying and de-fending life and liberty, of acquiring, pos-sessing and protecting property," "that no man can be deprived of his liberty or prop-erty but by the judgment of his peers, or the law of the land." Section 9. That the right of citizens to bear arms in defence of themselves and the state, shall not be ques-tioned. Section 21. The second section of the fourth article of the constitution of the United States, declares, "the citizens of each state shall be entitled to all privileges and immunities of citizens in the several states." The tenth section of the first article prohib-its any state from passing any law "which impairs the obligation of a contract." The second amendment provides, "that the right of the people to keep and bear arms shall not be infringed." The sixth. "that no man shall be deprived of liberty or property, without due process of law." In addition to these rights, Mr. Johnson had one other im-portant one, to which we invite your spe-cial attention, and a comparison of the right given and duty enjoined by the constitu-

tion of the United States with the eleventh section of the abolition act of 1780. "No person held to service or labour in one state, under the laws thereof, escaping into another, shall, in consequence of any law or regulation, be discharged from such service or labour, but shall be delivered up on claim of the party, to whom such labour or service shall be due." Const. U. S. art. 4, § 2, cl. 3. Pursuant to this provision of the constitution, the act of congress of the 12th February, 1793 [1 Stat. 302], was passed, not to restrain the rights of the master, but to give him the aid of a law to enforce them. This law has been read to you, together with the opinion of our respected predecessors, in the case of Hill v. Low [Case No. 6,494], to which we give our entire assent, so far as it affirms the unqualified right of the master to seize, secure and remove his fugitive slave. "To carry into effect the constitutional provisions on this subject, the act of congress of February 12th, 1793, was enacted. This act empowers the person to whom a fugitive from labour or service is due, his agent or attorney 'to seize or arrest such fugitive from labour, and to take him or her before any judge of the circuit or district courts of the United States residing within the state, or before any magistrate of a county, city, etc. wherein such seizure was made, and on proof of owing service to the claimant, either by affidavit ,or other evidence taken before a judge or magistrate of the state from which the fugitive escaped, the judge or magistrate of the state in which he or she is arrested shall give a certificate thereof to the claimant, his agent or attorney, which shall be a sufficient warrant for removing such fugitive.' By this it clearly appears that the claimant, his agent or attorney, has the authority of this law to seize and arrest without warrant or other legal process, the fugitive he claims, and that without being accompanied by any civil officer, though it would be prudent to have such officer to keep the peace. Whilst thus seized and arrested, the fugitive is as much in custody of the claimant, his agent or attorney, as he would be in that of a sheriff or other officer of justice, having legal process to seize and arrest, who may use any place proper, in his opinion, for temporary and safe custody." Do you perceive in this anything discordant with the feelings, the spirit, the policy, or the legislation of Pennsylvania, as manifested in the abolition act, or the one passed to amend and explain it? Do these constitutional and legal provisions give any right to the plaintiff, or enjoin any duty on others, which are not the fundamental principles of her own laws, as acted on and enforced in her own courts, as of paramount and supreme authority? If you have any doubt, here is the opinion of one of the most humane and benevolent judges who ever presided in any court, the late Chief Justice Tilghman, in delivering the opinion of the supreme court of this state. Wright v. Deacon, 5 Serg. & R. 63. "Whatever may be our private opinions on the subject of slavery, it is well known that our southern brethren would not have consented to have become parties to a constitution, under which the United States have enjoyed so much prosperity, unless their property in slaves had been secured. This constitution has been adopted by the free consent of the citizens of Pennsylvania, and it is the duty of every man, whatever may be his office or station, to give it a fair and candid construction." After referring to the constitution, he observes; "here is the principle—the fugitive is to be delivered upon claim of his master." But it required a law to regulate the manner in which this principle should be reduced to practice. It was necessary to establish some mode in which the claim should be made, and the fugitive be delivered up. He then recites the act of congress, and continues; "it plainly appears from the whole sense and tenor of the constitution and act of congress, that the fugitive was to be delivered up on a summary proceeding, without the delay of a formal trial in a court of common law. But if he had really a right to freedom, that right was not impaired by this proceeding—he was placed just in the situation in which he stood before he fled, and might prosecute his right in the state to which he belonged." This is in the spirit of the law, policy and feeling of Pennsylvania, as declared by the supreme court, and if the acts and proceedings of inferior courts and judges, in opposition to the rights of the owners of fugitive slaves are quashed as illegal, of what nature must be the lawless conduct of individuals, who, by an assumed authority, undertake to obstruct the execution of the supreme law of the land? The supreme court declares that the constitution of the United States would never have been formed or assented to by the southern states, without some provision for securing their property in slaves. Look at the first article, and you will see that slaves are not only property as chattels, but political property, which confers the highest and most sacred political rights of the states, on the inviolability of which the very existence of this government depends. The apportionment among the several states comprising this union, of their representatives in congress. The apportionment of direct taxes among the several states. The number of electoral votes for president and vice president, to which they shall respectively be entitled. The basis of these rights. is, "according to their respective numbers, which shall be determined by adding to the whole number of free persons, including those bound to service for a term of years, and excluding Indians, not taxed, three-fifths of all other persons." So that for all these great objects, five slaves are, in federal numbers, equal to three freemen.

You thus see that in protecting the rights of a master in the property of a slave, the constitution guarantees the highest rights of the respective states, of which each has a right to avail itself, and which each enjoys in proportion to the number of slaves within its boundaries. This was a concession to the southern states; but it was not without its equivalent to the other states, especially the small ones—the basis of representation in the senate of the United States was perfect equality, each being entitled to two senators—Delaware had the same weight in the senate as Virginia. Thus you see that the foundations of the government are laid, and rest on the rights of property in slaves—the whole structure must fall by disturbing the corner stones—if federal numbers cease to be respected or held sacred in questions of property or government, the rights of the states must disappear and the government and union dissolve by the prostration of its laws before the usurped authority of individuals.[2]

We shall pursue this subject no further, in its bearing on the political rights of the states composing the union—in recalling your attention to these rights, which are the subject of this controversy, we declare to you as the law of the case, that they are inherent and unalienable—so recognised by all our fundamental laws. The constitution of the state or union is not the source of these rights, or the others to which we have referred you, they existed in their plenitude before any constitutions, which do not create but protect and secure them against any violation by the legislatures or courts, in making, expounding or administering laws.

The nature of this case, its history, and the course of the argument, call on us to declare explicitly what is the effect of a constitutional protection or guarantee of any right, or the injunction of any duty. The twenty-sixth section of the bill of rights in the constitution of Pennsylvania, is in these words; "to guard against transgressions of the high powers we have delegated, we declare (we the people of Pennsylvania), that every thing in this article is excepted out of the general powers of government, and shall for ever remain inviolate." A higher power declares this constitution and the laws of the United States which shall be made in pursuance thereof, shall be the supreme laws of the

[2] In addition to these provisions of the constitution there is another, which is deserving of the most serious notice. In the fifth article, in relation to amendments of the constitution, is the following clause: "and that no state shall, without its consent, be deprived of its equal suffrage in the senate." If the small states should refuse to surrender this right, and the constitution be so amended as to abrogate slave representation and federal numbers, no hope could be indulged that the union could survive the event. The rights of the states within which slavery exists, and the rights of the small states must be preserved or surrendered together—a separation must be fatal to "a federal government of the states."

land, and the judges in every state shall be bound thereby, any thing in the constitution or laws of any state to the contrary notwithstanding. Const. U. S. art. 6, cl. 2. An amendment of the constitution is of still higher authority, for it has the effect of controlling and repealing the express provisions of the constitution authorizing a power to be exercised, by a declaration that it shall not be construed to give such power. [Hollingsworth v. Virginia] 3 Dall. [3 U. S.] 382. We have stated to you the various provisions of the constitution of the United States and its amendments, as well as that of this state; you see their authority and obligation to be supreme over any laws or regulations which are repugnant to them, or which violate, infringe or impair any right thereby secured; the conclusions which result are too obvious to be more than stated. Jack was the property of the plaintiff, who had a right to possess and protect his slave or servant, whom he had a right to seize and take away to his residence in New Jersey by force, if force was necessary, he had a right to secure him from escape, or rescue by any means not cruel or wantonly severe—he had a right to carry arms in defence of his property or person, and to use them, if either were assailed with such force, numbers or violence as made it necessary for the protection or safety of either; he had a right to come into the state and take Jack on Sunday, the act of taking him up and conveying him to the Billet was no breach of the peace, if not done by noise and disorder, occasioned by himself or his party—and their peaceable entry into the house of Mrs. Kenderdine was lawful and justifiable, for this purpose in doing these acts they were supported by laws which no human authority could shake or question. The power of the state was incompetent to impair the obligation of the contract of purchase from Rowley and Berrian, or to discharge Jack from the service of his master; he could not be impeded in the prosecution of his lawful pursuit, or restrained of his liberty, without the commission of an offence and process of law. Did they commit any breach of the peace? Joseph Kenderdine proves he was in the house when they entered and took Jack, he heard no noise, and did not see them enter—he informed his uncle of what had happened, came with him and his aunt to the wagon, but does not recollect what was said. Sarah Rakestraw testifies she heard Isachar ask them to prove their property, to which they replied, to stand off, and if he resisted they would blow him through—if this witness is credited, it shows the use of language rude and rough; but it did not amount to a breach of the peace without an offer to use an offensive weapon, or proof of some act done. Had such offer been made when Mr. Kenderdine was doing any act which interfered with their rights, they would have been justified in using as much force as was nec-

essary to enable them to proceed in their lawful business—his demand of proof of property was unauthorized, if the law gave him this right he would also have the right to judge of its sufficiency; but he was acting in his own wrong in making the demand, and they were under no obligation, legal or moral, to exhibit their papers, and submit to an examination by him in the highway. A request, at a proper time and place, and under circumstances where there would be any probability of a candid and impartial attention to legal evidence, respect for the rights of property, or the laws of the land, would, if refused rudely, have indicated a disposition on the part of the Jerseymen extremely reprehensible, and put their refusal on a very different footing from that in which it appears by the evidence of Miss Rakestraw; though even in such case they would not have been compelled by law to show their property or authority, yet rude conduct or language would have tended much to have palliated any excitement or violence which followed a refusal to accede to a proper request. On this subject there is much weight in the remark of the defendant's counsel, that there is a social law, a law of decent respect for the opinions of others, which ought not to be overlooked in the assertion of right—but it is most certainly a gross violation of this social law, to rudely demand as a right that which ought to be conceded only to courtesy of manner and propriety of time, place and circumstance.

The next act of the Jersey party which is complained of, is the threat to blow out the brains of Isachar Kenderdine, when he either had seized, or was about to seize one of their horses by the head, for the purpose of stopping them in the road, near the meetinghouse. At this time there was a crowd of some twenty or thirty about the wagon, and shortly after the plaintiff was struck in the head with a stone. Under such circumstances, a demand to prove property or to stop, was most unseasonable and improper, any attempt to stop them was unlawful, and would have justified the repelling such an attempt by as much force, and with such weapons as would be necessary to their safe passage to the Billet; what was said or done by them was no breach of the peace, or other offence, which in any manner justified their arrest or detention. 5 Serg. & R. 301.

The next inquiry is whether the plaintiff has been assaulted, beat, or imprisoned by the defendants, or either of them, and by whom. An assault is an offer to strike, beat, or commit an act of violence on the person of another, without actually doing it, or touching his person. A battery is the touching or commission of any actual violence to the person of another in a rude or angry manner. Imprisonment is any restraint of the personal liberty of another; any prevention of his movements from place to place, or his free action according to his own pleasure and will; a man is imprisoned when he is under the control of another in these respects or either of them, against his own will. It is false imprisonment when this is done without lawful authority, and such imprisonment is deemed an assault in law, though no assault in fact is made; the one includes both offences, the act being unlawful. In actions for injuries of this kind, all parties who are proved to have taken any part in the assault, battery or imprisonment, are principals, and answerable for all acts done by themselves or by any others concerned in the transaction, by their order, consent or procurement, or in pursuance and furtherance of an object or enterprize in which they have all engaged and which is illegal. If two or more agree or combine to effect an unlawful purpose, each one of the party is answerable for all acts done in, or leading towards the accomplishment of the joint object, directly connected with it or naturally consequential. If the object and purpose is entered upon and commenced by the parties concerned, and other individuals, or a crowd assembled in consequence, and consummate the act or join in its execution; the original parties are responsible for their conduct, though the immediate actors may be unknown to them, or have no other concerted agreement or connection with them, than by the unlawful acts committed, intended or tending to effectuate the original object and purpose. If a man does an unlawful act, apt or likely to do an injury to some person, and an injury is actually caused thereby, it is immaterial by what intermediate hand it is inflicted, the first wrong doer is directly answerable to the injured party as the immediate trespasser; as where a man threw a lighted squib into a crowded markethouse. it was thrown by one and another, till it struck a person, and put out his eye—the man who first threw the squib was made answerable. 3 Wils. 407. So is the law where one man publicly and unjustly charges another with the commission of an offence or crime of which he is innocent, and an injury is inflicted on him by an excited crowd. It is more dangerous than the squib, because more apt to be attended with fatal consequences, and no cry would be more exciting in Pennsylvania, in the most orderly community, than that of kidnapping. You will then understand the law to be well settled, that it is not necessary to bring home to any of the defendants, the definite act which has caused the injury; the law fastens the consequences of any illegal act upon them, which they have, in any manner, as before mentioned, directly or indirectly done, brought about or caused. Their mere presence, however, when the act is committed, does not make them accountable for it, without some participation on their part, or exciting, directing, consenting to or encouraging it—there must be some evidence of their acting, or causing others to act. If they

take any part you may consider any or each of them who do so, answerable for all that is done, unless you are satisfied that this interference was unconnected with the original and principal purpose. If an illegal act is done under colour of legal authority or process, from an officer who had no jurisdiction of the subject matter, or whose order or process is made or issued in violation of the law, the judge or justice, and party procuring it, are trespassers, so is the officer and all who act under him, if the process is void on the face of it (10 Coke, 76), and his who procures such order on false pretences, is the most aggravated case. It is not necessary to constitute false imprisonment, that the person restrained of his liberty should be touched or actually arrested, if he is ordered to do or not to do the thing, to move or not to move against his own free will, if it is not left to his own option, to go or stay where he pleases, and force is offered or threatened, and the means of coercion are at hand, ready to be used—or there is reasonable ground to apprehend that coercive means will be used, if he does not yield. A person so threatened need not wait for its actual application. His submission to the threatened and reasonably to be apprehended force, is no consent to the arrest, detention or restraint of the freedom of his motion—he is as much imprisoned as if his person was touched, or force actually used; the imprisonment continues until he is left at his own will to go where he pleases, and must be considered as involuntary, till all efforts at coercion or restraint cease, and the means of effecting it are removed.

On the part of Mr. Tompkins it is contended that the plaintiff has failed in his action as to him, for want of the notice required by the act of assembly which has been read. Purd. Dig. 492. This act applies to all official acts of a justice of the peace, and must be liberally construed so as to give them the full benefit of the protection intended by the notice. Though the act done is prohibited by law, and a penalty imposed, as for marrying a minor without the consent of his father (5 Bin. 24), or arresting a party by warrant for an act which is no offence, as travelling on Sunday, or if in the honest exercise of his jurisdiction, he judges erroneously of the legal character and consequences of an act done, and treats as an offender, a person who has committed no crime (5 Serg. & R. 301, 302), he is entitled to notice. On the other hand, if he acts from improper motives, in a case where he had no authority to act at all, or in the manner in which he did act, he will be deemed to have acted merely under the colour or pretence of his office, and not by virtue of it, and no notice is necessary. Nor if he took any part in this proceeding without intending to act as a justice of the peace in his official character, or did or directed any act to be done, in a matter whereof he had no jurisdiction. He must be clothed with official power to do the act officially, so that he is authorized to judge and decide whether the offence charged has been committed, or whether the thing done is punishable or within his cognizance—if he judges honestly, however mistakenly or ignorantly, he is entitled to notice in all such cases, though he cannot be justified in doing the act.

But if some things are indispensable to bring his official power into action, and those things appear not to have been done, his acts are null and void, and cannot be official; as issuing a warrant of arrest on a criminal accusation, without probable cause, supported by oath or affirmation—the power to do this is expressly excepted from all the powers of the government, by the bill of rights of Pennsylvania. No act can be by virtue of office, which the power of government is incompetent to authorize; it must be taken to be by the mere colour of office, and no notice is necessary, whatever his motives or intentions were. It is for you to decide on all the evidence in the clause applicable to Mr. Tompkins—how he acted in any of the scenes which occurred; you will consider him as any other defendant, as to all matters over which he had no official power to act, or in which he did not intend to act officially—you must find in his favour, if all his acts to the injury of the plaintiff were official. These are points of law which furnish the rules for the decision of this case; you will apply the evidence you have heard to ascertain the facts as they bear on each defendant.

In contrasting the conduct of the respective parties, you can decide which has acted within and under the authority of the law, and which has violated it; if the evidence has made the same impression on your minds as on ours, there cannot be a doubt that the defendants have inflicted injuries on the plaintiff for which he is entitled to redress at your hands. If the rights with which he was clothed by the supreme law of the land, are to be neither respected or protected, you or we cannot be protected in its administration; our powers are derived from the laws and constitution of the state and union; his are from the same source and authority, and from one source higher than either. That power which can at its pleasure alter and rescind any of the provisions of the constitution itself, by a constitutional amendment; by that power Caleb Johnson is invested with and guarantied in the enjoyment of rights which can be neither infringed or impaired by all the power of the state or general government, so long as the supreme law to which they are subordinate is obeyed. And shall it be permitted to individuals acting under the impulse of their own feelings and passions to do what is forbidden to the legislative power of the country, with no other check on their actions than what

they may call the social law of the place, or public opinion? This case illustrates the effects of indulging that false philanthropy which prostrates the law and the constitution in its zeal against slavery; it extends not merely to make the slave free, but freemen slaves. The plaintiff and his party were denied the use of a bed, and this by zealots in the cause of humanity and benevolence. What would have been said of Mr. Johnson if he had refused Jack a place, and means of rest and sleep—and it is to sanction such philanthropy that laws are to be disregarded, not only to justify the defendants in attempting to liberate Jack, but forcing his master from place to place as a criminal, prosecuting and now denouncing him as a felon. Though he offered manumission to his slave on the first night, and has since executed it, the defendants did not then, nor do they now, relent, even after the full investigation which the cause has undergone. We had hoped that they would have offered some circumstances of mitigation or excuse, which would have made the question for your decision one of mere compensation to the plaintiff for the injury he has actually sustained, without giving any thing in damages by way of public example, to prevent future outrages against the laws and the constitutional rights of citizens of the United States. We very much regret that by justifying their whole conduct, and boldly making the issue before you one of right, there is but one mode left to you by which you can meet your duty to the parties and the country. If there are any rights of property which can be enforced, if our citizens have personal rights which are made inviolable under the protection of the supreme law of the state and union, they are those which have been set at naught by some of the defendants. As the owner of property, which he had a perfect right to possess, protect, and take away; as a citizen of a sister state, entitled to all the privileges and immunities of citizens of any other states, Mr. Johnson stands before you on ground which no law can take from under him—it is the same ground on which the government is built. If the defendants can be justified in what they have done, we have no longer law or government —and if the personal liberty of the citizens can be thus violated with impunity, there remain to us no rights worth protecting.

The political aspect of public affairs cannot be overlooked when a court and jury are called on to decide on constitutional questions. The country has happily passed through some exciting and painful scenes, threatening its peace. No one can tell what danger may be impending over us, or how imminent it may be—but it is certain that there is much cause for vigilance in all those concerned in the administration of the law of the land, in enforcing its provisions, and by punishing all infraction, in such a manner, that it shall be in its operation, as well as in its name, supreme—the only test and standard of right and wrong. As citizens of Pennsylvania and the United States, it now rests with you to pass upon the rights in controversy between these parties; they are of the highest importance to every man in the community, and to the whole country, as affecting its deepest concerns. The question of damages is exclusively with you— though the defendants have not given in evidence or urged by their counsel, any matters in extenuation, we cannot help remarking that they appear to be respected in their neighbourhood; they are members of a society distinguished for their obedience and submission to the laws; than whom none other is more meritorious in their charity, benevolence and exemplary good conduct in all the relations of life. By what motives they were actuated towards the plaintiff, who never injured them or theirs in the pursuit of his property, is hard to imagine— it would seem that they were impelled by some cause not disclosed in the evidence or argument of the cause—some spirit or tone in public opinion, the temper of the times, some erroneous impressions of the policy of the law of 1820, or mistaken advice on its construction. This, however, is left to mere conjecture, as we are not authorized by the defendants to place their conduct on this footing, the case must be left to you on the question of right, according to the laws and constitution, as they have been shown to you, and on the question of damages, as you shall think the justice of the case demands.

Verdict for 4,000 dollars damages, and judgment on the verdict.